**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0031n.06

No. 08-6382

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NATALIE HORNBEAK-DENTON and ANNE HORNBEAK, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| GARY T. MYERS, TWRA Executive Director, individually and in his official capacity; JOHN C. GREGORY, TWRA Chief of Real Estate and Forestry, individually and in his official capacity; R. B. "BUDDY" BAIRD; MICHAEL CHASE; JOHNNY FORD COLEMAN; THOMAS H. EDWARDS; JAMES H. (JIM) FYKE; KEN GIVENS; MIKE HAYES; GARY K. KIMSEY; BOYCE C. MAGLI; MITCHELL S. PARKS; TODD A. SHELTON; HUGH T. "SKIP" SIMONTON, JR.; DAYNA L. WELCH, Commissioners of TWRC, in their official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE  OPINION |
| Defendants-Appellees. | ) ) | |

**FILED**
**Jan 19, 2010**
LEONARD GREEN, Clerk

**Before:  O'CONNOR, Associate Justice (Retired);*** **MOORE and COOK, Circuit Judges.**

**SANDRA DAY O'CONNOR, Associate Justice (Ret.).**   This case involves a property

dispute over 6.4 acres on the shoreline of Reelfoot Lake.  Natalie Hornbeak-Denton and Anne

Hornbeak (Appellants) claim ownership of the land and have taken various measures consistent with

that claim (such as excluding the public from the property and soliciting buyers for portions of it).

---

*   The Honorable Sandra Day O'Connor, Associate Justice (Retired) of the Supreme Court of the
United States, sitting by designation.

Tennessee also asserts ownership of this 6.4-acre parcel of land. Officers of the Tennessee Wildlife Resources Commission and Tennessee Wildlife Resources Agency (TWRA[1]) informed Appellants of Tennessee's ownership claim. They also threatened to bring a lawsuit against Appellants if they continued to exert control over the disputed territory. Appellants struck first and filed their own § 1983 suit against TWRA, arguing that their First and Fourteenth Amendment rights were violated when TWRA officials threatened to file a lawsuit against them. Appellants argue that the threat constituted a final determination of property rights without due process of law and amounted to retaliation for exercising their First Amendment rights to criticize TWRA. The district court granted TWRA's motion to dismiss on the pleadings, and we affirm.

I.

"The beauty of Reelfoot Lake is a natural resource unparalleled in its region." *Bunch v. Hodel*, 793 F.2d 129, 130 (6th Cir. 1986). Despite its beauty, Reelfoot Lake has been the source of considerable conflict (both human and natural) since its beginning. The lake was formed in the aftermath of the devastating New Madrid earthquakes in 1811 and 1812. A century later, it was the focus of national headlines when violence broke out. One night in 1908, a group known as the "Night Riders of Reelfoot Lake" killed a prominent attorney and left another for dead as a lingering dispute between public and private property interests came to a head. *Night Riders Slay Lawyers*, N.Y. TIMES, Oct. 21, 1908, at 1. Another of the Night Riders' intended targets that night was a man by the name of Judge Harris. *Rider Defies Death*, WASH. POST, Dec. 25, 1908, at 1 ("[T]he riders proposed to 'get' Judge Harris to whip him and cut off his head."). One year before the violence

---

[1] Various individuals acted on behalf of TWRA and the Tennessee Wildlife Resources Commission; for ease of reference we refer to these actors simply as "TWRA" throughout this opinion. Likewise, we refer to "Appellants" collectively without regard to whether any particular action was taken by Natalie Hornbeak-Denton or Anne Hornbeak.

2

broke out over ownership of Reelfoot Lake—and three years before meeting his own suspicious demise at the bottom of the lake, *Friends Say Harris Was Poisoned,* N.Y. TIMES, June 13, 1910, at 1—Judge Harris sold tracts of this embattled land to P.D. Hornbeak, Appellants' ancestor and predecessor in interest. Now, a century and several generations later, the dispute over that land resurfaces.

It is undisputed that Appellants own a significant amount of land on the perimeter of Reelfoot Lake, which has been in their family since the 1907 land transfer between Harris and P.D. Hornbeak. What is disputed is who owns a particular 6.4-acre strip of land directly abutting the lake. TWRA claims that Tennessee purchased this "buffer strip" through condemnation proceedings in 1930, and that this state-owned strip now sits between Appellants' property and the lake. Appellants disagree. The disagreement apparently never came to light until June, 2006, when TWRA sent a letter to Appellants demanding that they purchase a "lake use permit" for a dock Appellants maintained on the disputed land. It is unclear from the pleadings if Appellants had previously paid this permit fee since they built the dock in 2000. In any event, they paid it in 2006 under a letter of protest, complaining that similarly situated owners were not required to pay the permit fee.

A few months later, in October, 2006, Appellants sent letters to adjacent property owners claiming ownership of the disputed land and offering to sell portions of it. TWRA received notice of the solicitation letters and sent a letter explaining to Appellants that they were claiming property beyond their lots; as proof, TWRA attached a copy of a 1930 court order purporting to condemn the disputed land in Tennessee's favor. The letter explained that a TWRA official "would be glad to sit down with [Appellants] at [their] convenience and go over the agency's documentation and would be very interested in reviewing [Appellants'] survey and any other documentation." The

3

letter also made clear that, "[i]n the meantime, it is the agency's position that the buffer property is state owned property" and that if Appellants were to "proceed with any action which affects state property, the agency [was] prepared to proceed with any necessary legal actions in order to protect it." The letter requested that Appellants "notify any person to whom [they had] sent a form letter claiming the state's buffer property that [they did] not own the property." In a follow-up phone call, a TWRA official told Appellants that "the State had plenty of lawyers and would sue [them] for fraud if [they] attempted to sell this land."

Appellants then sent TWRA a letter on November 14, 2006, disputing the validity of the alleged condemnation on the grounds that their family was never paid following the condemnation proceeding. In May, 2007, Appellants posted signs on the disputed land, reading: "Private Property: Hunting, fishing, trapping or trespassing for any purpose is strictly forbidden; violators will be prosecuted." TWRA sent yet another letter in June, 2007, claiming to have uncovered proof of payment for the 1930 condemnation and attaching a certified copy of the receipt proving the disputed land was purchased by Tennessee. TWRA again demanded that Appellants cease their claims to the disputed property and refrain from posting signs or attempting to sell the land. The letter concluded:

> If, after reviewing the enclosed documentation, you feel that you still have a claim to this State land and you are going to proceed with your attempt to sell, lease, or deny public access to property owned by the State, please send the name and address of your attorney to me. The State plans to proceed with any legal action deemed appropriate for the situation directly with your legal representative.

At that point, letters gave way to litigation.

Appellants filed a § 1983 suit against various TWRA officials. They alleged abridgments of "specific property rights without due process" in violation of the Fourteenth Amendment, and they argued that TWRA's threats to sue constituted government retaliation for Appellants' earlier

4

criticisms of TWRA's permit system, in violation of their First Amendment rights. The district court granted TWRA's motion to dismiss. It held that the Fourteenth Amendment due process claim was unripe because the letters were not a final decision purporting to divest Appellants of property rights, but merely notified Appellants that legal proceedings would be necessary if no accord could be reached. It also rejected the First Amendment argument on the basis that TWRA did not take any adverse action against them sufficient to sustain a retaliation claim. Appellants now dispute these two rulings on appeal.

Shortly after the notice of appeal was filed in this case, Tennessee filed a state-court action to settle the property dispute; it is currently pending in the Chancery Court for Obion County. Appellants moved to hold this appeal in abeyance pending the resolution of that action, but we declined to do so without comment. *See* Clerk's Order of March 17, 2009. We do not reconsider staying the appeal because Appellants' constitutional claims do not depend upon who ultimately owns the disputed property.

## II.

Assuming all of Appellants' allegations are true, as we must in this posture, they have alleged nothing more than a run-of-the-mill property dispute where both sides assert conflicting claims to a single parcel of land. They do not allege any bad faith on the part of TWRA in asserting its claims. Appellants do not have a cognizable Fourteenth Amendment due process claim because they have not been deprived of anything. U.S. CONST. amend. XIV, § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law"). They do not have a valid First Amendment retaliation claim because no adverse action was taken against them. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 386–87 (6th Cir. 1999) (en banc) (to establish First Amendment retaliation claim, plaintiff must show "that the plaintiff engaged in conduct protected

5

by the Constitution or by statute, the defendant took an adverse action against the plaintiff, and this adverse action was taken (at least in part) because of the protected conduct"). What they do have is a disputed claim to property; that they did not see fit to avail themselves of state-court processes to resolve this dispute does not somehow turn it into a constitutional case. The parties dispute the exact type of state-court proceeding available to Appellants, but we have no reason to consider those arguments where Appellants' complaint did not allege the absence of adequate state-court processes to resolve this land dispute had they chosen to avail themselves of those remedies.

We first address Appellants' Fourteenth Amendment due process claim. The district court interpreted Appellants' claim as the equivalent of a claim for an uncompensated taking of land. Dist. Ct. Order at 10 (Oct. 17, 2008) ("[T]he [Appellants'] allegations, though couched in terms of procedural due process, are practically indistinguishable from a claim for governmental taking of property without just compensation."). So understood, any takings claim in this case is unripe because Appellants have never sought just compensation for any deprivation of property. *See* U.S. CONST. amend V ("[N]or shall private property be taken for public use, *without just compensation*") (emphasis added); *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985) ("Because respondent has not yet . . . utilized the procedures Tennessee provides for obtaining just compensation, respondent's claim is not ripe.").

But Appellants vehemently reject this interpretation of their claim. "The State has not taken their property," they argue, but "has threatened them with legal action if they do not cease claiming the property." Appellant Br. at 26. In this attempt to avoid a finding of unripeness, Appellants create a more fundamental problem with their due process claim: it appears they have not been deprived of anything at all. The Fourteenth Amendment only bars deprivations "of life, liberty, or property, without due process of law," it does not create a freestanding right to process absent such

6

a deprivation. U.S. CONST. amend. XIV, § 1. In attempting to articulate an injury unrelated to a taking of property, Appellants rely primarily on *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890 (6th Cir. 1991). In *Nasierowski* this court noted that "infirm process is an injury in itself," and "a procedural due process claim is instantly cognizable in federal court without requiring a final decision . . . from the responsible municipal agency." *Id.* at 894. But even an immediately cognizable procedural infirmity must result "in the instantaneous infliction of a concrete injury" before there is a claim, *id.* at 895 n.6, and we can discern no such injury here.

More fundamentally, and setting ripeness aside, Appellants did not state a procedural due process claim because their undisputed allegations amount to nothing more than TWRA making a threat of process. TWRA asserted its property rights, indicated a willingness to review any documentation Appellants had in support of their conflicting claim, and ultimately stated its willingness to defend its rights through proper legal channels if the parties could not settle their dispute. Appellants essentially assert TWRA committed a due process violation by making a threat of legal process. Appellants argue that TWRA's unequivocal assertion of property rights constituted a "final decision" without due process; but a mere assertion is not a final decision, even when stated in unequivocal terms. Government actors, like all people, are free to assert any good-faith legal claims they might have. The government does not deprive somebody of due process when making such assertions, especially where the assertions are accompanied by specific references to further legal proceedings to settle any dispute.

The consequence of Appellants' approach, as they acknowledged at oral argument, is that a state can never assert a right or threaten to institute court proceedings to defend its legitimate interests, but must actually institute court proceedings as a first recourse. The result is as untenable as the argument. We have never endorsed Appellants' view that a state actor's first option must

7

always be to litigate its property claims, and we refuse to do so now. To the extent Appellants survive a ripeness challenge by disavowing a takings claim we discern no independent due process violation from the face of Appellants' complaint.

We now turn to Appellants' First Amendment retaliation claim. This claim is also based on TWRA's threats to sue Appellants if they did not cease their attempts to sell the land in question. Appellants allege these threats were made in retaliation for their earlier criticisms of TWRA's methods for allocating lake use permits. Three elements are required to sustain a First Amendment retaliation claim:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X*, 175 F.3d at 394.

Appellants satisfy the first requirement, as their criticisms of TWRA's permit system is protected speech under the First Amendment. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) (holding restraints "upon criticism of government and public officials . . . inconsistent with the First Amendment"). And we can assume for the purposes of this appeal that, if an adverse action was taken against Appellants, it was motivated at least in part by this constitutionally protected criticism. *See Ctr. for Bio-Ethical Reform v. City of Springboro*, 477 F.3d 807, 823 (6th Cir. 2007) ("[C]laims involving proof of a defendant's intent seldom lend themselves to summary disposition.") (internal quotation marks omitted). Therefore, the sole question is whether TWRA's threats were sufficiently "adverse" to give rise to a retaliation claim. They were not.

The only adverse actions Appellants alleged were TWRA's threats of legal process to defend its good-faith claims to the disputed property. Appellants stress that on one occasion, there was a

8

verbal threat not to simply settle the property dispute, but to sue Appellants "for fraud if [they] attempted to sell this land." We have stated that "[m]ere threats . . . are generally not sufficient to satisfy the adverse action requirement." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004). This is not a hard and fast rule, as there are no doubt stand-alone threats that would deter a person of ordinary firmness from exercising their protected rights. We do not apply the adverse action inquiry mechanically, as "each step of the analysis is flexible enough to take into account the various contexts in which retaliation claims might be made." *Thaddeus-X*, 175 F.3d at 395. But in the context of this case, where the alleged threats were made by repeated offers and attempts to resolve the underlying property dispute, we have little doubt that they would not deter a person of ordinary firmness from criticizing TWRA's permit process. We adhere to the general rule that bare threats are insufficient to constitute adverse actions, and uphold the district court's dismissal of Appellants' First Amendment retaliation claim.

III.

We **AFFIRM** the district court's judgment.